Newman L. Ackerman v. Commissioner.
Ackerman v. Commissioner
Docket No. 4611-66.
United States Tax Court
T.C. Memo 1968-254; 1968 Tax Ct. Memo LEXIS 45; 27 T.C.M. (CCH) 1342; T.C.M. (RIA) 68254; October 31, 1968, Filed. *45 During the fall of 1960 petitioner conducted negotiations with John Z. Fletcher & Associates, Inc., an insurance agency for the sale of his own agency. On December 28, 1960, the sale was consummated by the execution of three separate agreements which were entitled as follows: (a) Agreement and Bill of Sale; (b) Noncompetitive Agreement; and (c) Employment Agreement. The Noncompetitive Agreement allocated $30,000 specifically to a covenant not to compete. The Agreement and Bill of Sale allocated $7,000 to the assets of the petitioner's agency and no good will or insurance expirations were listed in the agreement. These agreements were executed by petitioner in the presence of his accountant and lawyer, who had been consulted by him throughout the period of negotiations. Held: The allocation of $30,000 to the covenant not to compete was made freely and knowingly between two parties dealing at arm's length. Petitioner has failed to provide sufficient evidence that the substance of the transaction is not reflected in the written agreement. Accordingly, we hold that the allocation in question must be upheld for tax purposes. Charles P. Sacher, for the petitioner. Glen W. Gilson, *46 II, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in petitioner's income taxes as follows: Year
Deficiency
1961
$1,280.12
1962
1,323.01
1963
1,327.29
Petitioner has conceded certain minor issues concerning the disallowance of selling expenses, entertainment expenses and the allocation of a portion of petitioner's residence to business. The sole issue remaining for our decision is whether the value allocated to a covenant not to compete in a separate written contract pertaining to the sale of the petitioner's insurance agency should be upheld and recognized for tax purposes. Findings of Fact Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. Newman L. Ackerman (hereinafter referred to as petitioner or Newman) is an individual who, at the time of filing his petition with this Court, resided at 535 Valencia Avenue, Coral Gables, Florida. He filed his returns for the taxable years 1961 through 1963 with the district director of internal revenue, Jacksonville, Florida. 1343 For many years prior to 1961 petitioner operated *47 the Newman L. Ackerman Agency, a sole proprietorship, operating a general insurance agency in Miami, Florida. During the fall of 1960, petitioner conducted negotiations with the John Z. Fletcher & Associates, Inc., (hereinafter referred to as Fletcher or Fletcher, Inc.) an insurance agency of Jacksonville, Florida, for the sale of his agency. During these negotiations petitioner received two letters from Fletcher, the first of which was dated November 25, 1960, and provided, in pertinent part, as follows: We would like at this time during negotiations for the purchase of your agency along the lines previously discussed, to outline to you the method of purchase which our auditors have suggested as being most beneficial to both our office and to yourself - with the consideration for the tax aspects involved: 1. Immediate purchase of all fixed assets, at an appraised or agreed-upon price. 2. Payment to you of a net 37 1/2% of the gross commissions on all existing business of your agency, plus any renewal business produced by you to supplement this business, for a period of four years. This would approximate 150% of one annual commission as they now exist. This payment to be made *48 quarterly. 3. A Management Contract at a salary of $7,500.00 per year for five years, for you as Office or Branch Manager of our Miami operation. 4. In the event of your death or disability our purchase payments for the agency would continue to go to yourself or any designated third party until the completion of the contract. I want you to understand that this plan is flexible, and I think that we should discuss it with your auditors prior to our entering into a legal agreement. The second letter petitioner received from Fletcher, Inc., was dated December 12, 1960, and provided, in pertinent part, as follows: As you know, for some time we have considered opening an office in the Miami area. The suggestion that we take over the operation of your agency as head-quarters for our Miami Branch Office, employing you as Branch Manager, is a logical one. Let me make the following offer to you, for carrying out this plan: 1. John Z. Fletcher and Associates, Inc. will purchase all the physical assets of your office set-up, including typewriters, office furniture, files, air-conditioning unit, supplies, and other items necessary for the conduct of your agency, for the agreed price *49 of $6,000.00. We will draw up a Bill of Sale, if this is acceptable to you. I would appreciate your forwarding to me the itemized list of your inventory. 2. You are to enter into a Non-Competition Agreement with John Z. Fletcher and Associates, Inc., covering a period of four years, for which you will be remunerated by the payment of $7,000.00 annually. I am enclosing such an agreement, as prepared by our attorneys. I feel it is imperative that we have this agreement, as you will be in full charge of our Miami Branch Office and will have first-hand contact with our Companies and Insureds. 3. We will employ you as Manager of our Miami Branch at a salary of $7,500.00 a year, and you will be expected to perform in that capacity. I am also enclosing an Employment Contract. 4. The Branch Office of John Z. Fletcher and Associates, Inc. is to occupy the offices now occupied by Newman L. Ackerman Agency. It is my understanding that there is room available for expansion, in the adjacent premises when necessary. I would appreciate your giving us an Assignment of your leasehold interest as a tenant. * * * I am looking forward to the opening of this new operation in Miami. I am sure that *50 we can develop extensive business in that area. It will be a pleasure having a man of your knowledge and background to work with us. I would like to aim at January 1st, 1961, as the date for the completion of our arrangements. Please let me have your feelings on the above proposition, at your convenience. In addition to the draft of a noncompetitive agreement covering four years at $7,000 annually which was furnished petitioner with the letter of Fletcher, Inc., dated December 12, 1960, a second draft of a noncompetitive agreement was prepared covering four years at $7,500 annually. The second draft was not executed by the parties and the terms of the final executed agreement were at variance with both of the first two drafts. At various times throughout the aforementioned negotiations and up through the time that the final contracts were executed, petitioner was represented by his accountant and his lawyer. Petitioner depended upon the accountant for advice on any relevant tax aspects of the sale of the business. 1344 Prior to the petitioner's execution of the contracts, the accountant specifically considered the tax aspects of the final noncompetitive agreement as well *51 as the separate bill of sale for the assets of the business. The accountant and lawyer also witnessed petitioner's execution of the two aforementioned contracts. The accountant, in his tax advisory position, was of the opinion that the covenant not to compete in the contract would give rise to long-term capital gain to petitioner. This opinion was expressed to petitioner early in the negotiations, but was not verbally reiterated at the final execution. Fletcher considered a noncompetitive agreement vital to the acquisition of petitioner's insurance agency and petitioner was aware of this fact; Fletcher also was aware of the tax advantages involved and but for those would not have entered into the final agreements. The consummation of the sale, on December 28, 1960, involved three separately executed contracts which were entitled as follows: (a) Agreement and Bill of Sale; (b) Noncompetitive Agreement, and (c) Employment Agreement. Fletcher had executed the three contracts at an earlier time than petitioner and was not present when petitioner executed them. The executed Agreement and Bill of Sale provides, in pertinent part, as follows: WHEREAS, Associates has agreed to purchase *52 and Ackerman has agreed to sell the assets used by Ackerman in the operation of an insurance agency currently being conducted and run by him in the Miami, Dade County, Florida area; and WHEREAS, Ackerman has entered into a noncompetitive agreement with Associates and Associates has entered into an employment contract with Ackerman and Ackerman desires that Fletcher personally guarantee the sums to be paid thereunder; and WHEREAS, Ackerman desires by this instrument to transfer all of such assets to Associates; NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed as follows: 1. That Ackerman shall collect on premiums due on business written by him up to and including December 31, 1960 and shall retain said premiums for himself and shall be liable to the various insurance companies involved for any and all premiums due for business written on or before December 31, 1960. That Associates shall receive all premiums on business written after December 31, 1960 and shall be liable to the various insurance companies involved for their pro rata share of said premiums. That all debits and credits in reference insurance accounts accrued *53 after December 31, 1960 shall be the responsibility of Associates. * * * 3. Ackerman, for and in consideration of the sum of $7,000.00 to him paid by Associates, the receipt whereof is hereby acknowledged, has granted, bargained, sold, transferred and delivered and by these presents does grant, bargain, sell, transfer and deliver unto Associates the following goods and chattels: 1 Fedders Air Conditioner, 3-ton, reverse cycle w/ducts 1 electric typewriter 2 manual typewriters 1 executive chair 2 calculators 2 steel storage cabinets 25 5 X 8 files 24 3 X 5 files 81 9 X 3 files (policy files) 1 Revere tape recorder w/three speakers 4 desks (2 secretarial and 2 executive) 7 4-drawer file cabinets 3 typewriter desk chairs 8 straight back chairs 1 clock 1 6 cu. ft. refrigerator 1 exhaust fan 1 16" oscillating fan 1 wall cabinet 1 Harman Kardon radio 1 enamel top kitchen table together with other miscellaneous office equipment located at 2984 Coral Way, Miami, Florida. TO HAVE AND TO HOLD the same unto Associates, its successors and assigns forever. * * * The executed Noncompetitive Agreement provides as follows: NONCOMPETITIVE AGREEMENT
*54 THIS AGREEMENT, Made and entered into this 28th day of December, 1960, at Miami, Dade County, Florida by and between NEWMAN L. ACKERMAN, hereinafter called "Ackerman", and JOHN Z. FLETCHER & ASSOCIATES, INC., a Florida corporation, hereinafter called "Fletcher", 1345 WITNESSETH: WHEREAS, concurrently herewith Fletcher has purchased the assets used by Ackerman in the operation of an insurance agency currently being conducted and run by him in the area of Miami, Dade County, Florida; and WHEREAS, as a part of the purchase of such assets, Ackerman has agreed that he will enter into a noncompetitive agreement on the terms and conditions and for the consideration hereinafter contained; NOW, THEREFORE, in consideration of the premises and in further consideration of the sums to be paid by Fletcher to Ackerman as hereinafter provided, it is agreed as follows: 1. Ackerman agrees, from and after the execution of this agreement, that he will not at any time for a period of four (4) years from the date hereof, either alone or jointly, as agent for or employee of any person or persons, firms, partnerships or corporations excepting only as agent for or employee of Fletcher, either *55 directly or indirectly, set up, exercise, conduct or be engaged, employed or interested in or carry on the business of selling, soliciting or brokering insurance of any form or nature whatsoever, or engage in any occupation similar to or of the same nature as the business or corporation heretofore exercised and conducted by Ackerman and concurrently herewith sold and set over to and hereafter to be carried on by Fletcher, nor do anything to the prejudice thereof, within an area of one hundred (100) miles of Miami, Florida. 2. Ackerman agrees not to disclose the list of customers of the business heretofore conducted by him to any persons competing with Fletcher and shall not solicit said list of customers on behalf of himself or on behalf of any person, firm, corporation, partnership or other legal entity so competing. 3. As consideration for this Noncompetitive Agreement, Fletcher agrees to pay to Ackerman the total sum of THIRTY THOUSAND DOLLARS ($30,000.00); said sum of $30,000.00 to be payable as follows: The sum of ONE THOUSAND EIGHT HUNDRED SEVENTY-FIVE DOLLARS ($1,875.00) shall be paid on the first day of February, 1961; the sum of $1,875.00 shall be paid on the first day *56 of May, 1961; the sum of $1,875.00 shall be paid on the first day of August, 1961; the sum of $1,875.00 shall be paid on the first day of November, 1961; the sum of $1,875.00 shall be paid on the first day of February, 1962; the sum of $1,875.00 shall be paid on the first day of May, 1962; the sum of $1,875.00 shall be paid on the first day of August, 1962; the sum of $1,875.00 shall be paid on the first day of November, 1962; the sum of $1,875.00 shall be paid on the first day of February, 1963; the sum of $1,875.00 shall be paid on the first day of May, 1963; the sum of $1,875.00 shall be paid on the first day day of August, 1963; the sum of $1,875.00 shall be paid on the first day of November, 1963, and the final payment in the sum of SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500.00) shall be payable on the first day of February, 1964. 4. In the event that Ackerman should breach the terms and conditions of this agreement, it is agreed that any sums due and owing to him under the terms of paragraph 3 hereof shall be forfeited and Fletcher will not, from and after the date of such breach, be obligated to pay any sums of money to Ackerman. 5. Upon the death of Ackerman, all obligations *57 of Fletcher hereunder shall cease and determine. 6. Nothing herein contained shall be construed to prohibit Ackerman from instructing or lecturing on insurance matters at the University of Miami or before civic or other educational groups in the State of Florida. The executed Employment Agreement provides, in pertinent part, as follows: 1. Ackerman shall perform the services of branch manager of Fletcher in the Miami, Florida area. Such services shall consist of office manager and personnel manager of the Miami, Florida location and the soliciting of new insurance business for Fletcher, as well as handling and servicing existing accounts and using his best efforts to retain them for Fletcher. 2. Ackerman agrees to perform faithfully the duties hereby contemplated to the best of his ability and in a manner satisfactory to Fletcher and to devote his full time and efforts to the business of Fletcher; that during the term hereof Ackerman will not engage in any other business or sideline, except at the request, direction or with the approval of Fletcher; that he will truly and accurately maintain all records and will preserve all such records and make all such reports that Fletcher *58 may require and that he will surrender to Fletcher any records of which he may have custody and he will pay over moneys to Fletcher whenever directed to do so by Fletcher. 3. Ackerman shall willingly obey all rules applicable to and imposed by Fletcher constantly endeavoring to improve his knowledge of the business in an effort to increase the value of his services for the mutual benefit of Fletcher and himself. 1346 4. Ackerman will make available to Fletcher any and all information of which he has knowledge and which would be relevant to the business of Fletcher and will make all suggestions and recommendations which he feels will be of mutual benefit to Fletcher and himself. 5. In consideration of such services and the agreements herein contained, Fletcher agrees to pay to Ackerman as salary the following sum: The sum of Seven Thousand Five Hundred Dollars ($7,500.00) per year, payable on the 1st and 15th day of each month commencing on January 15, 1961. In addition to such salary, Fletcher shall pay any and all reasonable expenses incurred by Ackerman in travel, entertainment and sales promotion deemed by Fletcher to be in the interest of Fletcher; provided, however, *59 that all such expenditures shall be approved by Fletcher. 6. This employment contract shall be effective for a period of three (3) years commencing January 1, 1961 and shall be automatically renewed for successive one-year periods thereafter unless terminated as herein provided. Notwithstanding anything to the contrary herein, this employment contract may be terminated by either party upon giving sixty (60) days' prior written notice to the other. If Fletcher shall so terminate this agreement, Ackerman shall be entitled to compensation for said sixty-day period. 7. Ackerman agrees to keep secret the names of, and any other information relative to, any past, present or prospective customers and associates of Fletcher and that any information obtained by him as a result of his employment shall be treated as confidential information. On the termination of Ackerman's employment, he shall not divulge to any person, firm or corporation whatsoever any of Fletcher's trade secrets, business policies, business methods, the names of any of Fletcher's customers, or other matters made known to him during his employment. Subsequent to the execution of the contracts described above, Fletcher, *60 Inc., changed the name of petitioner's old insurance agency to John Z. Fletcher & Associates, Inc., operated it as a branch office, and employed petitioner as manager of the branch pursuant to the employment agreement. Petitioner and Fletcher, Inc., continued the employment agreement for a short time beyond the original 3-year term. It was terminated by Fletcher, Inc., by means of two letters each dated April 6, 1964. The pertinent portion of one letter, which letter was acknowledged by petitioner, provides as follows: It is understood that you will not solicit, broker or be paid commission on business currently on the books of John Z. Fletcher & Associates, Inc., or John Z. Fletcher & Associates of Miami, Inc. during the terms of the original noncompetitive agreement heretofore executed on December 30, 1960 as of the first day of January 1961. Petitioner fully honored the noncompetitive agreement but was back in the insurance business, although on a somewhat lesser scale than in prior years, writing policies for some of his old customers immediately after the noncompetitive agreement expired after four years. At the time of the trial herein, and at the age of 75, petitioner *61 was still engaged in the insurance business. For the years 1961, 1962, and 1963, petitioner reported the receipt of payments pursuant to the noncompetitive agreement as long-term capital gains. In 1965, Fletcher, Inc., sold the agency to Parker and Company at a price approximating one times the annual gross commissions. The respondent determined that the petitioner realized ordinary income in the amount of $7,500 in connection with payments received by petitioner under the noncompetitive agreement with John Z. Fletcher & Associates, Inc., in each of the years before us instead of capital gains as reported. In his petition petitioner assigned error to this determination alleging that the Commissioner erroneously classified income received from the sale of his insurance agency as ordinary income rather than income arising from the sale of a capital asset held for more than six months. Opinion This Court is once again faced with the question of whether the specific allocation of part of the purchase price of a business in written contracts for the sale of the business to a covenant not to compete should be binding upon the parties to that agreement. The tax consequences of recognizing *62 such allocation to a covenant not to compete are such that the seller must treat the proceeds therefrom as ordinary income while the purchaser can amortize that amount. If, instead, the covenant is treated as part of 1347 good will, the seller may treat the transaction as the sale of a capital asset, and the purchaser will not be allowed to amortize the cost. Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). Petitioner's main contention is that the noncompetitive agreement was not separately bargained and accounted for and was merely incidental to the transfer of the entire business; what in fact was bargained for was the good will of petitioner's insurance agency. In light of the supposed incidental nature of the covenant, which accompanied the transfer of good will, and citing Toledo Newspaper Co., 2 T.C. 794 (1943), petitioner concludes that any gain from the sale should be accorded capital gain treatment. Petitioner stresses that the initial letter of November 25, 1960, did not mention a covenant not to compete. The letter, instead, refers to a payment for petitioner's business, excluding fixed assets, *63 which would approximate 150 percent of the existing annual commissions. With the use of some loose terminology, petitioner depicts the above letter as the essence of the "agreement" between the two parties. This letter, at its best, was an early part of the negotiations and did not represent any agreement between the parties. The letter itself attests to the legal stage the parties had reached: I want you to understand that this plan is flexible, and I think that we should discuss it with your auditors prior to our entering into a legal agreement. At best, the letter of November 25 serves as an indication of the initial discussions looking toward a sale and of how the price was determined for the sale of the agency. It does not provide any specific allocations to a covenant not to compete, good will, or any item for that matter. This letter cannot be looked upon as the essence of the agreement between the parties when it tells us nothing of the allocations that would almost certainly be involved. The letter of December 12 made it quite clear to petitioner that Fletcher felt that the covenant not to compete was imperative and that a certain amount of money should be allocated *64 to it. We know that a draft of the noncompetitive agreement accompanied the letter of December 12 which, in accordance with the letter, allocated $28,000 to the covenant. Some time between this letter and December 28, another draft, allocating $30,000 to the covenant, was submitted to petitioner. It is quite apparent that petitioner, during this negotiation or bargaining stage, was fully apprised of Fletcher's demand for a specific allocation of $28,000 to $30,000 to the noncompetitive agreement and, from the evidence on record, we detect nothing to indicate any dissatisfaction on petitioner's part to this allocation. The evidence establishes that the covenant not to compete was actually dealt with as a separate item in the negotiations and bargaining looking toward the transaction and the parties fully intended to allocate the sum of $30,000 to it. Petitioner and Fletcher have given conflicting testimony as to the extent, if any, of discussions concerning the tax aspects involved in the allocation of consideration to the covenant. Petitioner claims that there were no direct discussions between Fletcher and himself concerning the tax aspects. Certain facts are established in regard *65 to this matter. In the initial letter, Fletcher suggested that "tax aspects" were involved and that petitioner consult his auditors. Petitioner's accountant was present at some of the negotiations between Fletcher and petitioner. He did furnish petitioner with advice, he read the final noncompetitive agreement, and was a witness to its execution by petitioner. During the early negotiations the accountant had advised petitioner that the sale of the business would give rise to long-term capital gains. After reading the final agreement, allocating $30,000 to the covenant not to compete, he was apparently still of the same opinion in regard to the tax treatment. He, supposedly, failed to vocally confirm his earlier advisement to petitioner at the final execution of the agreement. We have little difficulty assuming that his silence at this time was tantamount to a confirmation of his earlier stated opinion. The accountant was present to advise petitioner on any relevant tax aspects. If his opinion had changed in any way since his earlier advice, we feel sure that he would have so stated. Where, as here, parties enter into an agreement with a clear understanding of its substance and *66 content, they cannot be heard to say later that they overlooked possible tax consequences and so succeed in avoiding them. Hamlin's Trust v. Commissioner, 209 F. 2d 761, 765 (C.A. 10, 1954), affirming 19 T.C. 718 (1953). 1348 Petitioner contends that the allocation of $30,000 to the covenant is lacking in any independent economic reality. In essence, petitioner claims that the $30,000 is allocable to good will and the covenant not to compete is a nonseverable item to which no real value is attributable. He points out that the covenant was not even necessary to the sale in light of the terms of the employment contract. This argument completely overlooks the simple fact that the term of the covenant was four years, whereas the employment contract term was only for three, and that either party had the right to terminate the employment contract upon giving 60 days written notice to the other party. The employment contract could not, therefore, provide the necessary protection against competition when it might expire if not renewed after three years, and it could be terminated ex parte by petitioner on very short notice. Petitioner goes on to argue that *67 his age of 68 years at the time the agreements were executed was, by itself, sufficient to destroy any business reality to the noncompetitive agreement. The fact that petitioner, at the time of trial some years later, was then 75 and still actively engaged in the insurance business dealing with some of his old customers, attests to the business reality of Fletcher's demanding an agreement not to compete. Petitioner, as early as December 12, was apprised of Fletcher's feelings concerning the noncompetitive agreement and in his own words at trial stated that "Otherwise, they wouldn't have bought the agency." After this statement and in the light of all evidence of record we wonder how petitioner can turn around and seriously question the economic reality of the covenant. The final and most conclusive factor in substantiating the economic reality of this covenant can be found in the agreement itself which provides that the payments due thereunder were to terminate in the event of petitioner's death. If the petitioner was selling good will or what may be termed renewals or insurance expirations, he would not be willing to relinquish the right to payments for these intangible assets upon *68 his death. These intangible assets, which were never mentioned in the negotiations or the agreements, do not owe their continued existence to the petitioner's remaining alive, but the petitioner's ability to compete would obviously end upon his death. The cessation of payments in the event of petitioner's death is entirely consistent with the value and reality of the covenant and inconsistent with the argument that the payment was for the sale of good will or insurance expirations. Petitioner's contention that the noncompetitive agreement includes a sale of good will or insurance expirations finds little support in the agreement itself, which, as mentioned, is entirely silent as to these items. The agreement and bill of sale make no reference to good will or insurance expirations and such assets were not included in those listed assets to which the parties allocated $7,000. The record does not disclose whether or not any good will was included in petitioner's books and records as a business asset. There are certain other factors present in this case which raise doubts as to the contention that there was a transfer of good will. In most situations where there is a sale of good will, *69 the vendor does not remain on as an employee of the business. With the petitioner staying on as an employee of the insurance agency, and manager of the branch office to be operated in the same location, the necessity of transferring good will was, to a great extent, eliminated. The fact that Fletcher changed the name of petitioner's old insurance agency to John Z. Fletcher & Associates, Inc., is another indication in direct contradiction to a transfer of good will which inhereed in the original name of the agency, Newman L. Ackerman Agency. When parties to a transaction such as the one here involved specifically agree upon and allocate consideration to a noncompetitive covenant there must be strong proof presented when one party seeks to avoid the assigned value and escape the tax consequences which result from the allocation. Ullman v. Commissioner, supra. Where the parties negotiate and separately bargain for such a covenant so that it can be segregated from the rest of the assets transferred, consideration agreed upon and paid for the covenant constitutes ordinary income to the seller. Aaron Michaels, 12 T.C. 17 (1949). Where the parties understandingly *70 enter into such a contract and agreement the seller cannot later avoid its tax consequences by showing that he did not fully or clearly understand them when he made the contract. Hamlin's Trust, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953). Also, where the covenant has some independent basis in fact and is related to 1349 business reality so that it reasonably might be bargained for at the assigned consideration it will be upheld in court. Schultz v. Commissioner, 294 F. 2d 52 (C.A. 9, 1961), 34 T.C. 235 (1960). A review of all the evidence leaves us thoroughly convinced that the agreement allocating $30,000 as consideration for the covenant was made freely, willingly, and knowingly between two parties dealing at arm's length. It was realistically bargained for and dealt with as a separate item and had a significance of its own. In the absence of strong proof that the terms of the agreement do not reflect the true substance of the transaction, the tax consequences should be consistent with the terms of the written contract made by parties and we cannot reform their agreement for them. Benjamin Levinson [Dec. 27,820] 45 T.C. 380 (1966). *71 The evidence presented falls far short of the strong proof required by the tests laid down in the cited cases for us to conclude that the parties' own allocation of consideration did not reflect the substance of the agreement here in question. Furthermore, even if we should conclude that a more realistic allocation might have been made and that Fletcher was aware and vitally concerned with the tax advantages of the allocation whereas petitioner was not, the evidence presented does not permit a more reasonable allocation and the parties do not suggest how it might be done or that we attempt one. We conclude that it cannot be allocated in its entirety to good will as petitioner suggests. See Benjamin Levinson, supra at 389. Respondent has urged us to apply the rule of Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549 (1965), to the effect that a taxpayer who enters into a sales transaction and executes a covenant not to compete for a consideration specifically allocated thereto, may not, absent a showing of fraud, duress or mistake sufficient to vitiate the contract inter sese, challenge the allocation for tax purposes. *72 We are not presented with a situation here where a choice must be made between applying the Danielson rule or the "strong proof" rule of the long line of cited cases. Our conclusions already stated uphold the allocation made by the parties freely and understandably in their written contract. A fortiori, the same result would follow on this record under the Danielson doctrine which lays down more stringent criteria for upsetting a written contract allocation. Decision will be entered for the respondent.