RAYMOND J. BUCHNER AND AMY P. BUCHNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CALIFORNIA MAILING SERVICES, INC. Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Buchner v. Commissioner
Docket Nos. 15790-87, 30134-87, 37547-87
United States Tax Court
T.C. Memo 1990-417; 1990 Tax Ct. Memo LEXIS 434; 60 T.C.M. (CCH) 429; T.C.M. (RIA) 90417; August 6, 1990, Filed *434 Decisions will be entered under Rule 155. Harry J. Kaplan, for the petitioners. Jeffrey L. Heinkel, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases, respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows: Additions to Tax, I.R.C. Secs. [1]
Docket No.
Petitioners
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
15790-87
Raymond J. and
1983
$  58,458
$  2,923
*
$ 14,614
Amy P. Buchner
30134-87
Raymond J. and
1984
235,999
--
--
--
Amy P. Buchner
37547-87
California
1983
220,147
11,007
*
55,037
Mailing
1984
135,137
6,756
*
33,784
Services, Inc.
1985
109,180
5,459
*
27,295
*435 After settlement of some issues, the primary issues for decision are: (1) Whether certain payments made by petitioner California Mailing Services, Inc. ("CMS") were deductible business expenses or nondeductible capital expenditures, and (2) whether payments received by CMS as deposits to client postage impound accounts were taxable income to CMS upon receipt. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Raymond J. and Amy P. Buchner resided in Fremont, California, at the time they filed their petitions. Petitioner CMS is a California corporation. Its principal place of business was in San Jose, California, at the time it filed its petition. In 1970 or early 1971, Frank Thompson ("Thompson") formed CMS. CMS was engaged in the business of assembling, processing, and mailing direct mail advertisements and other literature. Thompson was the controlling shareholder and driving force in building CMS' business. He developed CMS' clients, and he maintained close contact with the clients. He made all significant business decisions for CMS. He hired and fired all employees, and he decided what equipment to purchase. In 1971, John Vanek *436 ("Vanek") began working for CMS as a machine operator. Vanek was given a five-percent stock interest in CMS. While working for CMS, Vanek became a skilled computer operator and repairman. Sometime prior to 1975, Vanek purchased an additional five-percent stock interest in CMS. Vanek then owned a total of 534 shares of CMS. In 1975, petitioner Raymond J. Buchner ("Buchner") began working for CMS as a supervisor and customer relations manager. Buchner's management responsibilities at CMS increased, and in 1977 Buchner for $ 12,000 purchased from Thompson's ex-wife 1,000 shares of CMS stock, representing an 18-percent interest in CMS. In late 1978, Thompson had a stroke and suffered some temporary paralysis on the left side of his body. The stroke apparently was related to the pressure of running CMS. In 1980 and 1981, Thompson took extended vacations from CMS, and due to his interest in real estate Thompson acquired a real estate agent's license and began working on a limited basis for Century 21. During Thompson's absences in 1980 and 1981, Buchner managed day-to-day operations of CMS. Thompson, however, retained final decision-making authority concerning all significant *437 business matters of CMS. When not at the offices of CMS, Thompson stayed in close contact with Buchner and continued to monitor and to direct CMS' overall business activities. In its fiscal year ending July 31, 1981, CMS' sales and taxable income increased significantly. During 1980 and 1981, Thompson, Buchner, and Ronald R. O'Neil ("O'Neil"), CMS' outside accountant and the personal accountant for Thompson and Buchner, discussed the possible sale of Thompson's interest in CMS and the transfer of control of CMS to Buchner. O'Neil billed CMS for his services in connection with these discussions. At the time of the discussions, Thompson, Buchner, and Vanek owned respectively 72 percent, 18 percent, and 10 percent of the stock of CMS. To assist in the discussions and to estimate the value of CMS, O'Neil used the book value of CMS as of July 31, 1981. He determined the unadjusted book value of CMS to be $ 300,000. O'Neil decreased this figure to take into account his understanding that the computer owned by CMS was worthless due to its age and condition. O'Neil did not attach any good will or going concern value to the assets of CMS. O'Neil determined the adjusted book value *438 of CMS to be in the range of $ 200,000 to $ 250,000. O'Neil also estimated the value of the stock of CMS by capitalizing the income of CMS using the average of CMS' net after tax income for the prior five years. Using this method, O'Neil estimated the value of the stock of CMS to be in the range of $ 150,000 to $ 400,000. In the discussions, Buchner insisted that as part of any purchase of Thompson's interest in CMS, Thompson enter into consulting and noncompetition agreements with CMS. Buchner considered these agreements essential because he had never managed a business by himself, because he wanted access to Thompson's advice and experience after the transaction concerning the business of CMS, and because Thompson personally had developed almost all of CMS' clients and had maintained close contact with the clients. By September of 1981, Buchner and Thompson reached an oral agreement under which Thompson would sell his interest in CMS, and Buchner would acquire control of CMS. O'Neil, on behalf of CMS, hired an attorney to draft the documents. Buchner informed Vanek of the proposed agreement and asked Vanek to sell his interest in CMS as well. In response, Vanek offered *439 to buy Thompson's stock in CMS. When Thompson refused, Vanek retained an attorney and threatened litigation, asserting that under CMS' bylaws, he had a right of first refusal to purchase Thompson's stock in CMS. Because of Vanek's position, Buchner and Thompson were unable to finalize the agreement to which they had tentatively agreed. After further negotiations in which CMS and the various individuals (other than Buchner) were represented by separate counsel, Thompson, Buchner, and Vanek reached a number of agreements concerning the acquisition by Buchner of control of CMS. To finalize the agreements, one of the attorneys drafted stock purchase agreements between Buchner, Thompson, and Vanek, and he drafted employment and consulting agreements and covenants not to compete between Thompson, Vanek, and CMS. On January 7, 1982, O'Neil received the agreements as drafted by the attorney and reviewed them with Buchner. The major elements of the agreements as drafted are summarized below. Under a document drafted as a stock purchase agreement between Thompson and Buchner, Thompson was to sell all 3,962 shares of his CMS stock to Buchner for $ 160,000 (or $ 40.38 per share). Under *440 an employment and consulting agreement between CMS and Thompson, CMS was to pay Thompson as an employee $ 1,300 per week for the last six weeks of 1981. For the first seven months of 1982, CMS was to pay Thompson as an employee $ 1,923 per week (i.e., at a rate of $ 100,000 per year). Beginning August 1, 1982 and for approximately eight years thereafter, CMS was to pay Thompson as a consultant $ 100,000 per year, payable in weekly installments of $ 1,923. The consulting services Thompson was to perform were described as follows: During the consultation term [Thompson] will render to [CMS] such services of an advisory or consultative nature as [CMS] may reasonably request, so that [CMS] may continue to have the benefit of his experience and knowledge of the affairs of [CMS] and of his reputation and contacts in the industry, and he will be available for advice and counsel to the officers and directors of [CMS] at all reasonable times by telephone, letter, or in person.
In the event Thompson died during the approximate nine-year term of the employment and consulting agreements, CMS was to continue making payments due under the terms of the agreements *441 to Thompson's survivors and heirs. Included in the employment and consulting agreements with Thompson was a covenant not to compete with CMS for the entire nine-year term of the agreements. No portion of the initial $ 160,000 to be paid Thompson under the stock purchase agreement was allocated to the covenant not to compete. Under a separate stock purchase agreement, Vanek was to sell all 534 shares of his stock in CMS to Buchner for $ 50,000 (or $ 93.63 per share), and Vanek was to enter into an accompanying employment agreement and a covenant not to compete with CMS. Under the agreements between CMS and Vanek, Vanek was to continue to work for CMS for two years, enabling him to become fully vested in CMS' pension and profit-sharing plan. The agreement also contained a two-year covenant not to compete for the period of Vanek's continued employment with CMS. CMS was to pay Vanek as an employee $ 525 per week from November 16, 1981, through December 31, 1981. Thereafter for 19 months (i.e., from January 1, 1982, through July 31, 1983), CMS was to pay Vanek as an employee $ 961.54 per week. For five months thereafter, from August 1, 1983, through December 31, 1983, CMS was *442 to pay Vanek $ 961.54 per week in exchange for a covenant not to compete with CMS. In the event Vanek died during the two-year term of the employment contract and the covenant not to compete, CMS was to continue making the payments otherwise due Vanek to his survivors and heirs. Buchner secured CMS' obligations to Thompson and Vanek under the employment and consulting agreements with a guarantee and pledge agreement under which Buchner pledged stock of CMS and his interest in a parcel of real property. The various agreements between CMS, Thompson, Vanek, and Buchner indicate that the amount of compensation to be paid Thompson and Vanek under the employment and consulting agreements was determined, in part, in recognition of the fact that in prior years Thompson and Vanek had been undercompensated by CMS. Thompson and Vanek agreed to report the amounts received under the employment and consulting agreements and under the covenants not to compete as ordinary income on all Federal and State income tax returns they filed. This Thompson has done. The record is silent as to how Vanek reported the amounts he received from CMS under these agreements. On January 8, 1982, the various *443 agreements were executed by the parties. Also on January 8, 1982, $ 210,000 was withdrawn from a savings account CMS maintained in a bank in California. Using these funds, cashier's checks in the amounts of $ 160,000 and $ 50,000 were obtained and paid to Thompson and Vanek, respectively, pursuant to the stock purchase agreements between Thompson and Vanek on one hand and Buchner on the other. Shortly after execution of the agreements and in consultation with Thompson, Buchner negotiated for the purchase on behalf of CMS of a new computer. The new computer was installed at CMS in November of 1982. It proved to be much more cost efficient than CMS' old computer, and it, among other things, enabled CMS to significantly expand its business. Also shortly after the agreements were executed, Thompson moved to Santa Rosa, California, approximately 100 miles from CMS' office in San Jose, California. From August 1, 1982 to July 31, 1985, Thompson visited CMS' office approximately three or four times a year. Thompson occasionally met with Buchner at O'Neil's office, and Buchner occasionally traveled to Santa Rosa to meet with Thompson and to discuss CMS' business. After execution *444 of the agreements, Thompson communicated with Buchner approximately 50 times a year concerning the business of CMS. During the meetings and telephone conversations, Buchner and Thompson discussed the purchase of new equipment, personnel, maintaining and developing clients, financing, and other matters pertaining to CMS' business. In years subsequent to the sale of his stock interest in CMS, Thompson briefly operated a jewelry business and currently operates a business manufacturing office furniture. For the first several months of 1982, Vanek worked at CMS four or five days a week for approximately four hours a day. During this period, Vanek arrived at CMS between 6:00 a.m. and 6:30 a.m. He ran jobs in the computer room and made whatever repairs were needed on the computer. In the spring of 1982, Vanek attended a scuba diving course at a commercial diving school. After graduating from the diving school, Vanek traveled to Costa Rica for one month to work as a commercial diver. Buchner did not object to the limited hours Vanek worked at CMS during 1982 because he was concerned primarily that Vanek complete his remaining term of employment with CMS without violating the covenant *445 not to compete and without instituting further legal proceedings against CMS. Vanek subsequently worked in another mail service business but apparently not in violation of the covenant not to compete. All payments due Thompson and Vanek under the agreements executed on January 8, 1982, were made by CMS. For the fiscal years ending July 31, 1983, 1984, and 1985, CMS reported unappropriated retained earnings per its books of $ 196,298, $ 189,030, and $ 164,692, respectively. Due to pretrial settlement of some issues that had the effect of increasing CMS' taxable income in those years, the amount of CMS' unappropriated retained earnings is greater than the amount reported. The financial statements of CMS reveal that no dividends were paid by it during the years prior to 1982. In the three years following execution of the agreements, CMS' receipts increased approximately 250 percent. During CMS' fiscal years ending July 31, 1973 through 1985, Thompson received from CMS total compensation relating to his employment and consulting work for CMS and to the covenant not to compete, as follows: Fiscal
Year
Total
Ending
Compensation
7/31/73
$  14,100
7/31/74
23,580
7/31/75
27,550
7/31/76
29,150
7/31/77
39,175
7/31/78
36,450
7/31/79
53,150
7/31/80
101,712
7/31/81
103,100
7/31/82
100,000
7/31/83
100,000
7/31/84
100,000
7/31/85
103,900
*446 During 1983, 1984, and 1985, Buchner received a weekly salary from CMS in the amount of $ 1,350, or $ 70,200 a year. Buchner also received annual bonuses from CMS, which were generally paid in CMS' following fiscal year. With respect to CMS' fiscal years ending July 31, 1983, 1984, and 1985, Buchner received from CMS bonuses and total salary and bonuses as follows: Fiscal
Total Salary
Year
and
Ending
Bonus
Bonus
7/31/83
$ 326,650
$ 396,850
7/31/84
319,007
389,207
7/31/85
234,273
304,473
Postage is one of CMS' major regular expenses. To insure that CMS was reimbursed for postage paid on behalf of clients, CMS maintained liability accounts entitled "postage impound." The postage impound accounts consisted of advance deposits CMS required from its clients to cover estimated costs of postage. In setting up postage impound accounts with respect to CMS' clients, the estimated cost of postage relating to CMS' projected business volume with each client for approximately two months was estimated and billed to the clients. Upon receipt, the money was credited to the postage impound accounts and deposited into CMS' business checking *447 account along with normal operating funds. CMS did not pay interest to its clients on funds deposited into the postage impound accounts. When clients terminated their business with CMS, amounts in their postage impound accounts were applied against outstanding postage expenses the clients had incurred and any balances were returned to the clients. Amounts credited to the postage impound accounts were designed to act as security deposits in the event clients failed to reimburse CMS for postage expenses. The postage impound accounts had total credit balances at the end of CMS' fiscal years ending July 31, 1982, 1983, 1984, and 1985 in the respective amounts of $ 102,338, $ 126,524, $ 135,799, and $ 142,365. As indicated, on his Federal income tax return for 1982 and for subsequent years, Thompson reported all income received from CMS under the consulting and noncompetition agreements as ordinary income. On its Federal corporate income tax returns for its fiscal years ending July 31, 1983, 1984, and 1985, CMS claimed ordinary business expense deductions for the payments made to Thompson and Vanek under the consulting, employment, and noncompetition agreements. Also, CMS treated *448 the amounts received and credited each year to the postage impound accounts as liabilities and did not treat them as income in the year of receipt. On their joint Federal income tax returns for 1983, 1984, and 1985, the Buchners did not report any portion of the amounts paid by CMS to Thompson and Vanek (under the stock purchase agreements and under the employment and consulting agreements and the covenants not to compete) as dividend income received from CMS. On audit of CMS' fiscal years ending July 31, 1983, 1984, and 1985, respondent determined that all but $ 45,066 of the total payments CMS made to Thompson and Vanek under the consulting and employment agreements and the covenants not to compete represented, in substance, additional compensation by CMS for the stock of Thompson and Vanek and therefore constituted capital, nondeductible expenditures of CMS. With respect to the postage impound accounts, respondent determined that payments CMS received each year from clients and credited to the postage impound accounts were includable in income by CMS upon receipt. On audit of the Buchners for 1983, 1984, and 1985, respondent determined that all but $ 45,066 of the payments *449 made by CMS to Thompson and Vanek during those years under the employment and consulting agreements and under the covenants not to compete constituted constructive dividends to Buchner on the theory, as explained above, that such payments constituted additional compensation for the CMS stock and that under the stock-purchase agreements Buchner, not CMS, had the responsibility to purchase the stock of CMS owned by Thompson and Vanek. Respondent, however, did not treat any portion of the initial $ 210,000 that CMS paid to Thompson and Vanek under the stock purchase agreements as constructive dividends to Buchner. Respondent argues that it did not do so only because (at the time the adjustments would have been made) the statute of limitations barred the adjustments for 1981 and 1982. Petitioners, however, argue that the statute of limitations for 1981 and 1982 was still open at the time respondent would have made such adjustments. OPINION Employment and Consulting Agreements and Covenants Not to Compete
In determining whether payments made by closely held corporations pursuant *450 to employment and consulting agreements and covenants not to compete constitute, in substance, additional compensation for stock owned by the former shareholders and therefore nondeductible capital expenditures, courts must determine, among other things, whether the payments and allocations under the agreements are reasonable, whether they have some independent basis in fact and business reality, and whether the parties genuinely bargained for such payments and allocations. , affg. ; ; ; . Where a corporation's assets are used to discharge the personal obligations of shareholders, the shareholders may be treated as having received constructive dividends, provided the corporation has sufficient earnings and profits. ; *451 ; . This raises a question of fact. . In this case, the evidence is not overwhelming either way. Both parties make arguments that are supported by various facts in the record. Among other things, we are strongly influenced in our decision by the testimony of Thompson, whom we regard as a particularly knowledgeable and effective businessman and a particularly credible witness. He, in substance, testified (contrary to his own personal interest) that the payments in question that he received constituted and were intended to constitute compensation for his continued employment and consulting services and for the covenant not to compete, as the payments were described in the written agreements. We believe that the amounts of compensation paid after the sale to Thompson and Vanek in connection with the employment and consulting agreements and the covenants not to compete were, in part, a reflection of the relatively modest amounts of compensation paid to Thompson and Vanek in prior years. *452 We also accept generally the testimony of O'Neil and of petitioners' expert witness regarding the value of CMS and the value of the stock of CMS, and we note respondent's failure to call an expert witness in that regard. Clearly, substantial compensation was justified to obtain Thompson's covenant not to compete with CMS for a substantial number of years after the sale. Although the amounts of compensation Thompson and Vanek were paid under the employment and consulting agreements and under the covenants not to compete appear substantial when compared with the compensation they were paid by CMS in prior years, the compensation reflects the importance to the continued success of CMS of Thompson's and of Vanek's obligations under the agreements. The employment and consulting agreements and the covenants not to compete were the product of knowledgeable, difficult, and arm's-length negotiations between Thompson, Vanek, Buchner, and CMS and represent a meeting of the minds. .The terms of the consulting agreement with Thompson indicate that Thompson was to be available for advice at all reasonable times by telephone, letter, *453 or in person. The record indicates that Thompson was fully able to comply with this obligation and did comply with it on numerous occasions. No specific amounts were allocated to the covenants not to compete. As stated, however, Thompson was obviously very important to the continued success of CMS, and any competition with CMS by Thompson would have been very damaging to CMS' business. We believe Buchner wisely imposed upon Thompson the nine-year covenant not to compete and that a significant portion of the payments to Thompson represented compensation for the covenant not to compete. Payment-after-death clauses, like those contained in Thompson's and Vanek's employment agreements, may arouse suspicion; however, we conclude in this case that they were the product of arm's-length negotiations and do not justify a recharacterization of the payments. . Also significant to our conclusion on this issue is the fact that the agreements required Thompson and Vanek to report as ordinary income on their tax returns the payments they received under the employment and consulting agreements and the covenants not to compete. If, *454 as respondent argues, most of the payments Thompson and Vanek received under the agreements, in substance, represented additional compensation for their stock interests in CMS, they would have been entitled to report the payments as capital gain. As noted in , Generally speaking, the countervailing tax considerations upon each taxpayer should tend to limit schemes or forms which have no basis in economic fact. The Commissioner should be slow in going beyond the values which the taxpayers state when such countervailing factors are present. * * * Since amounts saved by one taxpayer are generally made up by the other, there is no appreciable loss of revenue * * *
We conclude that the payments CMS made to Thompson and Vanek under the terms of the employment and consulting agreements and the covenants not to compete were based on arm's-length negotiations, reflected economic reality, were not excessive or unreasonable, and did not represent additional compensation for the CMS stock. The payments are deductible by CMS as ordinary and necessary expenses of its business. Postage Impound Accounts *455 Respondent argues that CMS had unfettered control over the payments received and credited to the postage impound accounts and that the payments therefore are includable in income upon receipt. Respondent notes that CMS commingled the payments with its normal operating funds and paid no interest on the balances in the postage impound accounts. In S.Ct. 589 (1990), a regulated utility company required certain customers to make advance deposits to assure prompt payment of their electric bills. The amount of the deposits generally was twice the customers' estimated monthly bills. If the utility company held the deposits for more than a stated number of months, it paid interest on the deposits. Customers could request credit reevaluations, and by demonstrating acceptable creditworthiness the customers could obtain refunds of the deposits. Customers could also obtain refunds of the deposits by making timely payments for a specified period of time. Customers entitled to refunds of their deposits could choose to have the deposits refunded immediately or applied against future bills. The utility company *456 reflected the deposits on its books as current liabilities. The utility company commingled the funds received as deposits with its general funds. In holding that the deposits did not constitute income to the utility company upon receipt, the Supreme Court explained that the proper focus is on the rights and obligations that the utility company assumed when the deposits were made. Commissioner v. Indianapolis Power & Light Co., 110 S.Ct. at 594. Generally, where taxpayers receive deposits subject to express obligations to repay them upon certain conditions, the taxpayers do not enjoy complete dominion over the deposits, and therefore the deposits do not constitute income upon receipt. Commissioner v. Indianapolis Power & Light Co., 110 S.Ct. at 593, 596. Because the utility company's right to keep the deposits was contingent upon the depositors' purchase of electricity and upon the depositors' later decisions to apply the deposits to future bills, the utility company did not enjoy complete dominion over the deposits upon receipt, and the deposits were *457 held not to be income to the utility company at that time. Commissioner v. Indianapolis Power & Light Co., 110 S.Ct. at 594, 596. In the instant case, CMS had no absolute right to retain payments received and credited to the postage impound accounts. Clients could make timely payments for postage when billed by CMS, and none of the payments credited to the clients' postage impound accounts would be used. On termination of their relationships with CMS, CMS' clients had the right to a full refund of the balances in their postage impound accounts. CMS thus did not enjoy complete dominion over the payments credited to the postage impound accounts, and the payments did not constitute income to CMS upon receipt. Additions to Tax
Because the additions to tax are based on the issues we have resolved in favor of petitioners, no additions to tax are applicable. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue.↩
*. Amount to be determined.↩