## Bergner *v.* Bergner, Appellant.

*Principal and agent—Purchase of stock—Compensation of agent—
Continuance of the relation.*

Where a person offers himself as an agent for the purchase of stock of
a corporation, and his offer is accepted, the fact that he is not to receive
compensation from the principal, does not affect the relation of principal
and agent.

Where an agency has been once entered upon, except the contrary be
shown, the law will presume that whatever was done in furtherance of
the original scheme which the agency was created to effect, was done
under and through the agency.   The burden of showing that the relation
was changed before or during the transaction, rests upon the party so
affirming.

An agent to purchase cannot be allowed, except as his principal as-
sents, to purchase for himself.   He can acquire nothing by such adverse
purchase, even though he contribute of his own means or credit to effect
it; the product will belong to the principal exclusively.

To relieve an agent from the duties and obligations which he has assumed as such, his renunciation of the agency must not only be positive and unequivocal, but it is essential that it be made known to the principal. An undisclosed purpose to renounce is without effect. As the intelligent assent of the parties is necessary to establish the relation, so its dissolution must rest upon the knowledge of both.

Where a son without means of his own requests his mother to permit him to purchase in his own name with moneys provided by her, certain blocks of stock of a corporation in which the son is an official, and it appears that the stock is to be offered for sale at intervals, and that both parties know that the moneys of the mother will not be sufficient to purchase all of the stock, the son does not effectively renounce his agency by saying to his mother after her moneys are exhausted, that he is going out to do something for himself, and thereafter pledging with his own notes the stock previously acquired, and using the proceeds thereof to purchase the stock subsequently offered for sale.

Argued April 3, 1907. Appeal, No. 124, Jan. T., 1907, by defendant, from decree of C. P. No. 5, Phila. Co., Dec. T., 1905, No. 4,172, on bill in equity in case of Ella Annear Bergner v. Gustavus W. Bergner. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an account.

Complainant averred in her bill that her son purchased for her stock in the Bergner & Engel Brewing Company, in which he was employed, with money furnished by her; that subsequently he purchased for her additional stock of the brewing company and also of the T. M. O'Brien Coal Company, with money furnished by her, title being taken in his name, but as the market price of the stocks was greater than the amount advanced by her the balance was raised by the son as trustee using the stocks as collateral; that he agreed to pay interest and reduce the principal out of the dividends and pay the balance to her; that he had, nevertheless, refused to pay over such balance of dividends due her, and, denying that he is her trustee, had further incumbered the collateral by making thereon a personal loan to himself; that he had inconsistently offered various compromises and settlements to her, and had threatened to have the loans called. The prayer was for the appointment of a receiver to take up and hold the stock pending

suit, for an injunction enjoining any sale, for a decree that the son is her trustee for all the stock, and for an accounting.

The separate answer of Gustavus W. Bergner averred that the facts are as follows : The husband of complainant died in May, 1903, insolvent. He had large holdings of stock in the Bergner & Engel Brewing Company, which were hypothecated for loans. In February, 1904, one of these loans was called, and the son, knowing that his mother had received a considerable sum from the sale of a property standing in her name at Bar Harbor, advised her to purchase the stock. She accordingly gave him the necessary money, and he purchased the stock for her.

In April, 1904, a second loan ($20,000) was called, but she had only $11,800 available for investment. She, however, gave him authority to use the stock previously purchased to borrow money for his own benefit, and he so borrowed $6,250 on his own note with the stock as collateral, and with the combined amounts purchased the stock which was offered for sale.

In May, 1904, a third loan was called, and the mother having no money for investment gave her son permission to use for his own benefit that portion of the second purchase which belonged to her.

Accordingly he purchased the stock, partly with his own money, but almost entirely with money obtained on his personal notes, using the stocks of both the second and third purchases as collateral. He also secured a guarantee of the interest for one year on the larger loan. He denied that he is a trustee except for the first and a portion of the second purchase. He averred that no regular account was ever rendered by him or demanded by complainant, but that he has paid the interest on the loans when due, and has advanced to complainant out of the dividends more than she is actually entitled to; that she has at various times, through counsel, requested an adjustment, but never claimed all of the stocks, and that agreements were twice drawn and agreed to by him and complainant, placing all the stock in trust and providing for a division of the net income, but which she later refused to execute, in none of which did she claim ownership of the entire number of shares, and that a third settlement, in which she was to receive the amount of stock actually purchased with her money,

was in process of adjustment when complainant filed her bill without notice.

. · The auditing judge, MARTIN, P. J., reported as a conclusion of law that the complainant and defendant were joint owners of ·all the stock, except that which was purchased at the first sale, and ·that each was entitled to share in proportion to the money contributed respectively to the purchase price.

The court in banc, in an opinion by RALSTON, J., modified the finding of the auditing judge, and entered a decree directing the defendant to assign all of the stock to the complainant, and account to her for dividends received.

*Errors assigned* were various findings of fact and conclusions of law, and the final decree.

*John G. Johnson*, with him *Ellis Ames Ballard*, for appellant.

· *Thomas Leaming*, for appellee.

OPINION BY MR. JUSTICE STEWART, October 21, 1907:

The findings of fact in this case serve inadequately to indicate the real question in issue.   There is no separate and distinct finding with respect to the original convention of the parties to the present controversy.   That there was such convention is a fact that admits of no dispute, and the evidence abundantly discloses the object, terms and scope of the undertaking that was to be entered upon pursuant thereto.   Any statement of the case from which these matters are omitted must necessarily be imperfect; they have a significance too large to be overlooked.   That they may be derived inferentially from such facts as have been specifically found, may be true in a measure; but to give them no larger expression is either to obscure or depreciate them, likely both.   "When the appellate court is satisfied that facts. have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake.   In the several stages of the proceeding there is no place for perfunctory consideration of the evidence relative to the facts in dispute."   Worrall's App., 110 Pa. 349.   That the true issue may

be clearly defined, a brief statement of the facts as we find
them to be—and here we avoid all controverted matters—is
necessary.

C. W. Bergner, the husband of plaintiff, and father of de-
fendant, who before his death, proved to be insolvent, had
pledged with the Northwestern Bank as collateral for certain
loans made to him, stock in the Bergner & Engel Brewing
Company, and stock in the O'Brien Coal Company, and had
also pledged a still larger amount of the Brewing Company's
stock with the Fourth Street National Bank as collateral for
like loans. The scheme proposed by the defendant to the
plaintiff contemplated the purchase of this stock for the latter,
the purchase to be made by the defendant in his own name,
he to be permitted to so hold it in order to secure to himself
the voting power of the stock, but all the money required to
effect the purchase was to be supplied by the plaintiff. In
the financial result of the undertaking, whether it should show
profit or loss, the defendant was to have no share. He was
an official of the brewing company, and the benefit he ex-
pected to derive from the transaction was in the larger sup-
port he would have with this stock in friendly hands. It was
contemplated that by selling certain real estate which she
owned, the plaintiff could realize in cash upwards of $47,000.
While it was not expected that all the stock could be pur-
chased for any such sum, it was thought that with what it did
suffice to purchase in hand, a way could be found to obtain
the balance. To the scheme as thus presented by defendant,
the plaintiff assented, and in furtherance of it proceeded to
make sale of her real estate. The result of the sale was dis-
appointing, since it yielded her but $36,500. Notwithstanding
this, however, the undertaking was proceeded with, not in
the way originally proposed, by paying off the loans and lift-
ing the collateral, but by purchase of the collateral as the
loans should be called. This involved no change in object or
purpose, but was simply a modification of details. The first
block of collateral stock thereafter offered at sale, February,
1904, was 125 of preferred Bergner & Engel held by the
Fletcher estate. This block of stock was not one of those re-
ferred to when the scheme was originally entered upon, but it
was purchased by the defendant with money advanced by the

plaintiff for the purpose, just as though it had been, and he makes no question as to her ownership of it. The next to be sold, April, 1904, was the block of 200 shares of Bergner & Engel preferred and 250 shares of the O'Brien Coal Company stock, held by the Northwestern Bank. On the morning of the day appointed for the sale of this stock, defendant applied to plaintiff for the money necessary to make the purchase. He then discovered that of the money she had received from the sale of her real estate, she had expended—how, it does not concern us to know—including the amount advanced to purchase the Fletcher stock—some $24,000, and that there was left at her command only $11,800, an amount wholly inadequate for the purchase contemplated. The purchase was accomplished, however, by using the $11,800 advanced by plaintiff, supplemented by $6,250, which defendant borrowed on his note by using the stock previously purchased as collateral thereto. The next to be sold, May, 1904, was the block of Bergner & Engel stock held by the Fourth Street National Bank, 671 shares of preferred, and 650 of common. To effect the purchase of this stock, the plaintiff being unable to advance any cash, the defendant paid to the bank $5,000, which he borrowed elsewhere on his own note secured by a pledge of the O'Brien coal stock, and gave to the bank his own note for the balance of the purchase money, $45,000, secured by a pledge of 679 shares of the preferred stock bought in this purchase, together with the 200 shares of preferred Bergner & Engel stock of a prior purchase, and a guarantee of a year's interest by several outside parties. The total amount of stock purchased by the defendant in these several transactions, was 1,004 shares of preferred, and 650 common Bergner & Engel, and 150 shares of the O'Brien Coal Company. All of this stock was purchased by defendant in his own name, and he continues to so hold it. The contention on the part of the plaintiff is that the stock is hers ; while defendant insists, with respect to all except the stock bought of the Fletcher estate, that it was purchased on a joint account, and that as to so much of it, plaintiff and defendant are joint owners, each entitled to share therein in proportion to the money contributed respectively.

We have stated the original undertaking as understood by

the parties when it was entered upon, and have given the facts as to what was actually done. We are now prepared to understand the actual relation in which the parties stood towards each other in the inception. In defining this relation it is well to be exact in terms. That the scheme contemplated an eventual trusteeship in the defendant for the stock purchased in his own name is obvious; but an earlier relation was established by the agreement, and no trust could arise except as something was done under it. This earlier relation was that of principal and agent; nothing more, nothing less. The defendant had offered his services, and had become the plaintiff's agent for the purchase of this stock on the terms agreed upon. With this much determined, the legal consequences are not open to question. The fact that defendant was not to receive compensation from the plaintiff, does not affect the relation: Rankin v. Porter, 7 Watts, 387. The principles applicable to cases of this kind are familiar and not difficult of application. A not unimportant one in this connection is, that where the agency has been once entered upon, except the contrary be shown, the law will presume that whatever was done in furtherance of the original scheme which the agency was created to effect, was done under and through the agency. The burden of showing that the relation was changed before or during the transaction, rests upon the party so affirming. Another no less important is, that an agent to purchase cannot be allowed, except as his principal assents, to purchase for himself. He can acquire nothing by an adverse purchase, even though he contribute of his own means or credit to effect it; the product will belong to the principal exclusively. It is unnecessary to cite authorities in support of either of these propositions. They result necessarily from the fact that agency is a recognized fiduciary relation; its vital principle is good faith, without which the relation could not exist. This brings us to the actual open dispute between the parties—the plaintiff insists that the agency continued throughout; defendant contends that it was renounced and abandoned before the purchase was made of the second block of stock, when it was discovered that plaintiff had but $11,800 left to effect a purchase requiring upwards of $18,000, and defendant was compelled to raise the difference on his own note, secured by a

pledge of plaintiff's stock with her permission. Reduced to fewer words, the question upon which the case turns is, did or did not the defendant renounce and abandon his agency before making this purchase of stock? There is no specific finding on this point, presumably because none was requested, and yet its controlling significance must be allowed.

The defendant's right to terminate his agency at any time is conceded. If he exercised it when he says he did, in advance of the second purchase, in a way the law will adjudge sufficient, then his contention as to his ownership of a proportionate part of the stock must be sustained; otherwise not. The qualification as we have stated it is a necessary one; the privilege must be exercised in a way the law will adjudge sufficient. No fixed form or method is prescribed; but to be effective to relieve the agent from the duties and obligations he has assumed, the renunciation must not only be positive and unequivocal, but it is essential that it be made known to the principal. An undisclosed purpose to renounce is without effect. As the intelligent assent of the parties is necessary to establish the relation, so its dissolution must rest upon the knowledge of both. The rule is laid down in 1 Am. & Eng. Ency. of Law (2d ed.), under the title of Agency, page 1082, supported by the authorities there collated is, that "An agent to purchase will not be allowed to purchase for himself and hold the property in his own name, unless he has openly and notoriously discharged himself from his agency." However much this statement of the rule may be qualified by varying circumstances, certain it is that a renunciation under any conditions, to enable an agent to do what is here expressed, must be communicated to the principal in such a way as to bring home to him notice of the agent's determination. It is not pretended that the defendant expressed to the plaintiff a determination to end his agency, at any other time during all these transactions, than on the occasion when he applied to her for money to make the second purchase of stock, and found that she had but $11,800 in cash remaining. It is necessary to recur to his testimony to see just what there transpired. We give the questions and answers. "Q. Didn't you take the 125 shares of Bergner & Engel preferred you had bought the month before and multiply it by fifty, and suggest it was pos-

sible to borrow $6,250 on that in order to buy the stock for her? A. I said I would try to do it. Q. In order to buy the stock for her? A. No. Q. Haven't you just said so? A. No. Q. Didn't you say that you wanted the money to buy this stock for her and you said 'yes'? A. It certainly would be acquired proportionately. Q. Didn't you say the reason you wanted more money was to buy the stock for her? A. I told her on that morning, because she hadn't the money, that I was going out to do something for myself. Q. That is all you told her? A. Yes, sir. Q. What did she say? A. She said 'all right.' She was in tears. Q. That is all she said? A. Yes, sir. Q. And all you said? A. All that I can remember."

Evidently up to this point of time the defendant recognized the agency he had assumed as continuing. Because he was disappointed in the amount of money the plaintiff could then furnish he determined to renounce it. This is the reason he gave. It implies that the original scheme for purchasing all the stock had been made impracticable by this shortage of cash. But why should this be so? The situation then confronting the parties was bound sooner or later to occur in the course of the transaction. Had the entire amount derived from the sale of plaintiff's real estate been applied to the purchase of the stock, when it came to the last and heaviest sale, the amount remaining in the fund would have been wholly inadequate, and it would have become necessary to borrow money to accomplish the purpose by a pledge of what had previously been purchased. There can be no doubt whatever that such recourse was contemplated from the beginning. What possible difference could it make that the point when borrowing became necessary was reached sooner than the defendant expected? This fact did not imperil the scheme, as the result showed, for the additional amount required for the second purchase was readily borrowed by a pledge of stock. Nor did it prevent the purchase of the heaviest block by the same method when sold later on. It was altogether unnecessary, if it was defendant's purpose to renounce his agency, to assign any reason; but when he says that he assigned one which both he and the plaintiff must have known had no basis for support, and that the latter accepted it and acquiesced in

what he proposed, at such a cost to herself, without a word of explanation or remonstrance other than expressed by her tears, he affords at least some ground for doubting the accuracy of his statement. We do not find that the plaintiff specifically denies that defendant said in the course of conversation, that he was going out to do something for himself, or that her attention was directed to the remark; but she does deny that he intimated then, or at any other time, that he intended to buy the stock for himself. She says that on this particular occasion he told her he would buy the stock for her. Assuming that he told her what he says he did, that he was going out to do something for himself, did he by this intend that she should understand that his agency was at an end, and should she have so understood it? While such a remark is entirely consistent with a purpose to renounce the agency, it is anything but a direct and express declaration of such purpose. That he intended it to have the meaning he would now give it, we think, for several reasons, most improbable. First, because there is nothing in the evidence that shows any abandonment of the objects which the parties set out to accomplish; and, as we have said, nothing had occurred to make the original scheme any more difficult than it must have seemed from the beginning. Second, because he did nothing under this alleged notice that the plaintiff could not have done as effectively without his assistance; what he did was to raise money on his own note by a pledge of her stock. It does not appear that her note would not have answered quite as well or that she was ever asked to give it. Third, because nothing the defendant could do, except as plaintiff furnished the means, could avail anything in accomplishing the particular object in which he had the deepest interest, namely, securing for himself the voting power of the stock. This last could be effected only as he used such resources as the plaintiff could supply, for, so far as the evidence warrants any inference on the subject, defendant was absolutely without resources of his own. He borrowed nothing for the second purchase except what he obtained on a pledge of plaintiff's stock, and in the entire transaction he advanced but $135 of his own, which in the end he charged up to plaintiff's account. His letters show how keenly alive he was to the importance of lodging the Bergner & Engel

stock in friendly hands. This was his stake, on which he admits his business future depended. As the facts appear, he could imperil it only as he separated himself from the plaintiff in the undertaking. It is not reasonable to suppose that he so intended. These same considerations make it most improbable that the plaintiff could have understood from the remark a purpose to change the relation theretofore existing.

Nor does the subsequent conduct of the parties furnish ground for any different conclusion. It would extend this opinion unduly were we to review here the evidence on this branch of the case. In the several efforts that were made to settle and compromise, it is true that plaintiff demanded much less than her present claim; but nowhere do we find any admission on her part that any change had been made in the original agreement under which the entire ownership of the stock was to be in her. On the other hand, the whole course of the defendant's dealing with the plaintiff throughout; the partial accounts and settlements he submitted to her; the acknowledgment he wrote himself and subscribed containing a clear admission that the stock purchased was the plaintiff's; the fact that in an account rendered he charged her with the sum of $135 which he had advanced in connection with the third purchase, which he now claims was wholly for himself; the admissions testified to by Mr. Warwick to the effect that the stock was the plaintiff's, all these considered, even in the light of the defendant's explanations, leave the case clear of all possible doubt.

In the issue raised the burden was upon the defendant. The bill alleged, not in so many words, but substantially, an agency, and that the stock was purchased under it. The answer admitted the agency, but alleged that it had been abandoned before the completion of the transaction. The bill charged that a trust resulted. This the answer denied. The inquiry thus became an open one. Though the trust and all the circumstances out of which it arises, may be denied under oath in the answer, yet the facts may be proved by parol in opposition to the answer: 1 Perry on Trusts, p. 109.

In conclusion we repeat, the governing question in the case is one of mixed law and fact—did the defendant acquit himself of his agency? Upon the law and evidence we find that

he did not. It follows that the stock he purchased belongs to the plaintiff. In placing himself in antagonism to his principal he has burdened himself with the costs of this proceeding. The final decree in the court below does justice between the parties, and is affirmed.