# United States Court of Appeals
## For the First Circuit

No. 18-2105

HOFF STAUFFER,
Administrator of the Estate of Carlton Stauffer,

Plaintiff, Appellant,

v.

INTERNAL REVENUE SERVICE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Selya, Circuit Judges.

Thomas E. Crice, for appellant.
Julie Ciamporcero Avetta, Attorney, Tax Division, Department of Justice, with whom Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Travis A. Greaves, Deputy Assistant Attorney General, Andrew E. Lelling, United States Attorney, Gilbert S. Rothenberg, Attorney, and Joan I. Oppenheimer, Attorney, were on brief, for appellee.

September 16, 2019

**TORRUELLA, Circuit Judge.** This case concerns Internal Revenue Code ("IRC") provisions governing the timeliness of a claim for refund of overpaid federal taxes and the renunciation of a durable power of attorney under Pennsylvania law. Hoff Stauffer ("Hoff") filed suit on behalf of his father's estate (the "Estate") against the Internal Revenue Service ("IRS"), alleging that the agency improperly denied his April 2013 claim for his father's 2006 tax refund as untimely, see I.R.C. § 6511(a)(2018). The Estate averred that the applicable statute of limitations for the filing of a tax refund claim was tolled due to Hoff's father's financial disability, see id. § 6511(h)(1). The district court dismissed the Estate's complaint, holding that the limitations period was not tolled because Hoff held a durable power of attorney authorizing him to act on his father's behalf in financial matters. See Stauffer v. Internal Revenue Serv., No. CV 15-10271-MLW, 2018 WL 5092885 (D. Mass. Sept. 29, 2018); see also § 6511(h)(2)(B). After careful review, we affirm.

## I. BACKGROUND

In October 2005, Hoff and his father, Carlton Stauffer ("Carlton"), executed a written durable power of attorney (the "DPA").[1] Hoff requested the DPA to better assist Carlton in the

---

[1] The DPA was executed in Pennsylvania, while Carlton was a Pennsylvania citizen, and references provisions of the Pennsylvania power of attorney statute. Accordingly, the district

-2-

management of his finances because Carlton was both elderly and mentally ill.  The DPA granted Hoff broad powers over Carlton's finances, including the authority to "prepare, execute and file in [Carlton's] behalf . . . any and all income tax declarations and returns . . . and to represent [Carlton] before the Internal Revenue Service . . . with respect to any claim or proceeding having to do with [his] tax liabilities."

After the DPA came into effect, Hoff discovered that Carlton had lost track of millions of dollars in assets in the form of uncashed checks, matured bonds, and stocks.  Hoff began recovering these assets and opened an investment account in Carlton's name at T. Rowe Price to deposit the recovered funds.  In lieu of the existing DPA, T. Rowe Price required its own standardized, limited power of attorney form (the "TRP POA"), which Carlton executed on January 5, 2006.  The TRP POA only authorized Hoff to conduct transactions within Carlton's T. Rowe Price account (e.g., to buy, sell and trade account assets, and to make withdrawals).

Despite Hoff's financial management efforts, the father-son relationship began to deteriorate in March 2006.  During a

court held that it was governed by Pennsylvania law.  Stauffer, 2018 WL 5092885, at *10.  Neither party challenges this choice of law holding on appeal.

-3-

face-to-face meeting (the "March 15 meeting"), Carlton and Hoff had an argument regarding Hoff's management of his father's financial affairs. Part of the tension resulted from Hoff's insistence that, as a condition of his continued assistance, Carlton stop permitting his girlfriend to overspend his money.[2] To control Carlton's girlfriend's excessive spending, Hoff suggested that Carlton limit her expenses to a monthly allowance. A falling out ensued.

Hoff claims to have told Carlton at the March 15 meeting that he would no longer be exercising any rights granted to him under the DPA. Then, Carlton drafted three notices revoking the DPA. However, he never sent these notices, and Hoff never received them. Carlton and Hoff also stopped talking. Carlton would not pick up Hoff's calls or return his calls or messages. The fallout led Hoff to tell his sister (Carlton's daughter), Carlton's accountant, and Carlton's attorneys that he was no longer acting as his father's agent under the DPA.[3]

---

[2] According to Hoff, Carlton's girlfriend was spending from $100,000 to $200,000 per year -- an amount Carlton could not afford. By way of comparison, Carlton was only spending $50,000 to $60,000 per year on himself.

[3] In May 2006, two of Carlton's attorneys contacted Hoff for his assistance in closing the sale of a family business. Hoff responded by telling the attorneys he was no longer acting as Carlton's agent under the DPA and thus could not help them. The attorneys then drafted a new POA, but neither Carlton nor Hoff

The father and son, however, reconciled approximately four years later as reflected by a series of financial transactions. In May or June 2009, Carlton loaned Hoff $1.25M to purchase a home. With Carlton's permission, Hoff withdrew this amount from the T. Rowe Price account. Then, in 2012, Carlton asked Hoff for $100,000, which Hoff withdrew from the same account at his father's request.

In late October 2012, Carlton passed away. Hoff was named the personal representative of the Estate the following month. As representative of the Estate, Hoff filed his father's tax returns for the tax years 2006 through 2012 in late April 2013. The 2006 return reported a tax overpayment of $137,403, of which the Estate claimed a refund of $97,364 and requested that $40,000 of the remaining $40,039 be applied to Carlton's 2007 tax liability. The IRS denied the claim for the 2006 tax refund as untimely pursuant to I.R.C. § 6511(a), which establishes the statutory timetable for filing tax refund claims. After an internal appeal, the IRS issued its final denial of the Estate's refund claim on January 7, 2015.

On February 5, 2015, the Estate filed suit in the U.S. District Court for the District of Massachusetts against the IRS[4]

_____

ever signed it.

[4] Hoff's complaint incorrectly named the IRS, rather than the

-5-

seeking a refund of Carlton's 2006 tax overpayment. The Estate's complaint alleged that its refund claim (filed in 2013) was timely because Carlton's financial disability tolled the three-year statutory period to file the claim under I.R.C. § 6511(h)(1). On September 29, 2018, the district court dismissed the Estate's complaint, finding that: (1) Carlton had the capacity to execute the DPA; (2) Hoff was, as of 2005, authorized under the DPA to act on behalf of Carlton in financial matters for the purposes of I.R.C. § 6511(h)(2)(B); (3) Hoff did not renounce the DPA; and (4) Carlton did not effectively revoke the DPA. Stauffer, 2018 WL 5092885, at *6-11. Accordingly, the court held that the statutory period for the filing of Carlton's 2006 tax refund claim was never tolled under § 6511(h)(1) and thus had expired in October 2010,[5] which consequently deprived the court of subject matter jurisdiction over the Estate's suit. See Muskat v. United States, 554 F.3d 183, 194 (1st Cir. 2009) ("[A] district court has jurisdiction to adjudicate only those refund claims that have first

---

United States, as defendant. See 28 U.S.C. § 1346(a)(1). The government has not raised an issue in this regard, and we do not address it.

[5] Because Carlton did not timely file a tax return for 2006, the district court held that the applicable statute of limitations for the filing of his refund claim was two years and not three years as the Estate alleged in its complaint. Stauffer, 2018 WL 5092885, at *1 n. 2; see I.R.C. § 6511(a).

-6-

been 'duly filed' with the Secretary of the Treasury." (citing 26 U.S.C. § 7422(a))).  This appeal ensued thereafter.

## II.  ANALYSIS

The Estate's attack on the district court's decision is two-pronged: its first swing is directed at the court's factual finding that Hoff never renounced the DPA, while the second takes aim at the court's legal conclusion that the DPA qualified Hoff as a person authorized to act on behalf of Carlton in financial matters for the purposes of I.R.C. § 6511(h)(2)(B).  The Estate misses on both swings.  We address the Estate's arguments in inverse order, directing our attention first to its challenge of the district court's interpretation of I.R.C. § 6511(h)(2)(B).

### A.  Hoff's Qualification as a Person Authorized to Act on Behalf of Carlton in Financial Matters Pursuant to § 6511(h)(2)(B)

We review the district court's interpretation of I.R.C. § 6511(h)(2)(B) -- the legal basis for the court's decision to dismiss the Estate's complaint for lack of subject matter jurisdiction -- de novo.  Muskat, 554 F.3d at 194.

The IRC states that "[n]o suit for a tax refund may be maintained in a United States district court 'until a claim for a refund . . . has been duly filed.'  26 U.S.C. § 7422(a).  Thus, timely filing of a refund claim is a jurisdictional prerequisite to a tax refund suit."  Me. Med. Ctr. v. United States, 675 F.3d 110, 114 (1st Cir. 2012) (citing Phila. Marine Trade Ass'n v.

-7-

Comm'r, 523 F.3d 140, 146 (3d Cir. 2008)). The timeliness of a refund claim[6] is governed by I.R.C. § 6511(a), which provides that a "[c]laim for credit or refund of an overpayment of any tax imposed" must be filed "within 2 years from the time the tax was paid" when, as here, "no return was filed by the taxpayer." This two-year statute of limitations is commonly referred to as a "look-back period." Comm'r of Internal Revenue v. Lundy, 516 U.S. 235, 239 n.1, 240 (1996). Generally, a taxpayer who fails to file his refund claim within the applicable limitations period[7] may no longer obtain his overpayment refund or credit. I.R.C. § 6511(b)(1).

Notwithstanding, the applicable limitations period will be tolled or "suspended" if a taxpayer is financially disabled. Id. § 6511(h)(1) ("In the case of an individual, the running of the [look-back] periods . . . shall be suspended during any period of such individual's life that such individual is financially disabled."). The IRC defines a financially disabled taxpayer as an individual who "is unable to manage his financial affairs by

---

[6] "A tax return that claims a refund is considered a 'claim' for purposes of § 6511." Walter v. United States, No. 09-420, 2009 WL 5062391, at *6 (W.D. Pa. Dec. 16, 2009) (citing 26 C.F.R. § 301–6402–3(a) (1, 5), (c)).

[7] When, unlike here, a taxpayer files a timely tax return, the applicable limitations period for any overpaid tax refund claim is three years. I.R.C. § 6511(a).

reason of a medically determinable physical or mental impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 6511(h)(2)(A).

Not all financially disabled individuals, however, are entitled to the benefit of § 6511(h)(1)'s tolling provision.  The IRC sets forth an exception to the exception:  "An individual shall not be treated as financially disabled during any period that . . .[any] person is authorized to act on behalf of such individual in financial matters."  Id. § 6511(h)(2)(B).  But that provision does not provide any statutory guidance as to what qualifies a person as one "authorized to act on behalf of [a financially disabled taxpayer] in financial matters."  Id.  It is this statutory vacuum that makes way for Hoff's challenge of the district court's interpretation.

The Estate urges us to adopt a reading of § 6511(h)(2)(B) under which a person will be considered "authorized to act on behalf of [a financially disabled taxpayer] in financial matters" only if he or she has: (1) authority to file the financially disabled taxpayer's tax returns; (2) a duty to file the financially disabled taxpayer's tax returns; and (3) actual or constructive knowledge that the tax returns for a particular year have to be filed on behalf of the disabled taxpayer.  The Estate claims that,

because Hoff did not meet these three purported requirements, the statute of limitations for the filing of Carlton's tax refund should have remained suspended through his death in October 2012 due to his financial disability.  We disagree.

As a preliminary matter, we do not need to decide whether the Estate's first purported requirement -- authority to file the financially disabled taxpayer's tax returns -- must be met in order to strip a disabled taxpayer of § 6511(h)(1)'s tolling benefit.  Hoff's authority to file Carlton's tax returns is not at issue here.  The DPA explicitly granted him the authority to file Carlton's tax returns, as well as any other tax-related claim before the IRS.  Thus, ever mindful of the principles that guide our interpretation of a statute, we turn to the Estate's purported "duty" and "actual or constructive knowledge" requirements for a person to qualify as "authorized to act on behalf of [a financially disabled taxpayer] in financial matters" under § 6511(h)(2)(B).

We have generally recognized that "[t]he words of the statute are the first guide to any interpretation of the meaning of the statute . . . if the meaning is plain." Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir. 1999).  First, we "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 919 F.3d

121, 128 (1st Cir. 2019) (quoting <u>Robinson</u> v. <u>Shell Oil Co.</u>, 519 U.S. 337, 340 (1997)).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  <u>Id.</u> (citation omitted).[8]  "If the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"  <u>Id.</u> (quoting <u>United States</u> v. <u>Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989)).  However, if "the language is not plain and unambiguous, we then turn to other tools of statutory construction, such as legislative history."  <u>Id.</u> (citing <u>Arnold</u> v. <u>United Parcel Serv., Inc.</u>, 136 F.3d 854, 858 (1st Cir. 1998)).

Here, the key word for our analysis of § 6511(h)(2)(B) is "authorized."  By urging us to adopt the "duty" and "constructive knowledge" requirements, the Estate asks us to interpret the term "authorized" in § 6511(h)(2)(B) beyond its plain and unambiguous meaning.  And this we cannot do.  The Estate's proposed definition of "authorized" finds no support in § 6511(h)(2)(B)'s plain language or its statutory context.

---

[8]  To examine § 6511(h)(2)(B)'s context we "look to the provisions of the whole law, and to its object and policy," <u>U.S. Nat'l Bank of Or.</u> v. <u>Indep. Ins. Agents of Am., Inc.</u>, 508 U.S. 439, 455 (1993) (internal quotation omitted), and "consult[] any precedents or authorities that inform [our] analysis," <u>Dolan</u> v. <u>U.S. Postal Serv.</u>, 546 U.S. 481, 486 (2006).

-11-

Consistent with the interpretative scheme outlined above, we begin our statutory examination with the plain meaning of "authorized." See Greebel, 194 F.3d at 192. The term "authority" is not defined in the IRC, and the use of the term "authorized" in § 6511(h)(2)(B) is too situational to draw parallels to its use elsewhere in the code.[9] Since the other provisions of the IRC are not helpful to our analysis here, we turn to the dictionary definition of the term for further clarity.

The root word for "authorized" is "authority," which is defined as: (1) "[t]he official right or permission to act, esp. to act legally on another's behalf; esp., the power of one person to affect another's legal relations by acts done in accordance with the other's manifestations of assent," *Authority*, Black's Law

---

[9] Compare I.R.C. § 6511(h)(2)(B), with, e.g., id. § 5609 (stating that "the seizing officer is authorized to destroy," inter alia, "unregistered still[s] . . . where it shall be impracticable to remove the same"), § 7808 ("The Secretary [of the Treasury] is authorized to designate . . . depositaries in each State . . . ."), and § 9040(b) ("The Commission is authorized . . . to institute actions in the district courts of the United States to seek recovery of any amounts determined to be payable to the Secretary [of the Treasury] as a result of an examination and audit . . . ."). But see id. § 5559 (drawing a distinction between situations where the Secretary of Treasury is "required" to make a quantitative determination versus situations where he is "authorized" to make such determinations), § 7509 ("[T]he Secretary [of the Treasury] shall be authorized and directed . . . ." (emphasis added)), § 7516 (using the term "authorized" in conjunction with "discretion"), and § 7804(a) (using the terms "authorized" and "shall" in the same sentence in reference to the Commissioner's powers to appoint and supervise employees).

-12-

Dictionary (11th ed. 2019); (2) "the power delegated by a principal to an agent," id.; (3) "power to influence or command thought, opinion, or behavior," *Authority*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/authority (last visited Aug. 15, 2019); and (4) "freedom granted by one in authority," id. These dictionary definitions reveal no ambiguity. None of the above definitions imply that the existence of a "duty" is a requisite for a person's authority. To the contrary, the provided definitions illustrate that one who acts with "authority" has been bestowed with the power to perform an action on another's behalf. By contrast, a duty imposes an obligation to perform a certain act.[10] While there are duties that flow from grants of authority (e.g., those of loyalty and care in agency law), the relevant question here is whether in this context, definitionally speaking, one who is "authorized" to take a certain course of action should be understood narrowly to mean only one who has an affirmative obligation to take such action. The answer is clearly

---

[10] The same dictionaries cited for the definition of "authority" define "duty" as: (1) "[a] legal obligation that is owed or due to another and that needs to be satisfied," *Duty*, Black's Law Dictionary (11th ed. 2019); (2) "that which one is bound to do, and for which somebody else has a corresponding right," id.; (3) "obligatory tasks, conduct, service, or functions that arise from one's position (as in life or in a group)," *Duty*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/duty (last visited Aug. 15, 2019); (4) "a moral or legal obligation," id.

-13-

no. The plain language of § 6511(h)(2)(B) simply does not contemplate the Estate's purported "duty" requirement. Because the term "authorized" is unambiguous within its statutory context, our examination of its meaning stops here, and we need not proceed to examine § 6511(h)(2)(B)'s legislative history. See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 919 F.3d at 128.

Therefore, we hold that a person may be considered "authorized to act on behalf of [a financially disabled taxpayer] in financial matters" for purposes of § 6511(h)(2)(B) even if he has no affirmative obligation to act on the taxpayer's behalf.

Our decision is consistent with that of at least one other court that faced a similar controversy. In Plati v. United States, 99 Fed. Cl. 634, 640 (2011), the plaintiff's son and attorney-in-fact -- who brought the action on his mother's behalf (the financially disabled taxpayer) -- averred that he was unable to file her refund claim within the applicable limitations period because of his mother's insistence on "keeping control" over her financial affairs. Based on this, the son sought that his mother be granted "refuge in the suspension of the look-back period because of [his mother's] financial disability," despite his authority to file his mother's tax returns pursuant to a DPA. Id. at 640-41. In denying the plaintiff's requested relief, the United States Court of Federal Claims stressed that:

-14-

> [U]nder [I.R.C.] § 6511(h)(2)(B), the relevant question is whether any person was "authorized to act on behalf of [the taxpayer] in financial matters," (emphasis added), not whether the authorized person actually took such action. The statute is not concerned with whether the taxpayer's affairs were actually managed, nor whether they were managed competently, but rather whether someone had been given the authority to act. One may certainly possess the authority conferred by a power of attorney without implementing, exercising, or acting on that power.

Id. at 641 (alterations in the original) (quoting Bova v. United States, 80 Fed. Cl. 449, 458 n.12 (2008)).[11] Within the context of § 6511(h)(2)(B), we see no significant difference between the son's failure to file his mother's tax returns due to her insistence on controlling her finances in Plati and Hoff's failure to file Carlton's tax returns due to their falling out. In both cases, the sons -- as agents of their parents -- failed to act pursuant to the authority they had been granted.

The Estate's argument in support of an "actual or constructive knowledge" requirement is even less persuasive. The statute's plain language does not include any term into which such a requirement can plausibly be read, nor does the Estate point to any contextual basis (e.g., provisions of the whole law) from which

---

[11] In Bova, 80 Fed. Cl. at 458 n. 12, the United States Court of Federal Claims held that a non-verbal agreement between a financially disabled taxpayer and her accountant stipulating that he was not to act pursuant to the power of attorney had no bearing on the applicability of I.R.C. § 6511(h)(2)(B).

-15-

it can be inferred.  Thus, we also hold that, for purposes of § 6511(h)(2)(B), a person "authorized to act on behalf of [a financially disabled taxpayer] in financial matters" is not required to have actual or constructive knowledge of the need to file tax returns in a specific year.[12]

Accordingly, the DPA qualified Hoff as a person "authorized to act on behalf of [Carlton] in financial matters" pursuant to § 6511(h)(2)(B).  We move on to Hoff's factual challenge.

## B.  Renunciation of the DPA

We review the district court's factual findings for clear error.  Me. Med. Ctr., 675 F.3d at 114.[13]  As we have stated

---

[12] As a factual matter, we would not, in any case, be persuaded to believe that Hoff lacked constructive knowledge of the need to file Carlton's tax returns.  The record reflects that he was fully aware of his father's gross financial mismanagement.

[13] On the eve of oral argument, Hoff submitted a letter pursuant to Fed. R. App. P. 28(j), arguing for the first time that our review of the district court's determination that he did not renounce the DPA is de novo.  Relying on the Pennsylvania Superior Court's decision in Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co., 182 A.3d 1011 (Pa. Super. Ct. 2018), appeal denied, 191 A.3d 1288 (Pa. 2018), Hoff contended that whether a principal-agent relationship exists is a pure question of law subject to de novo review whenever the facts underlying the relationship are undisputed.  Although Hoff's reliance on Consolidated Rail is misplaced, we need not wade into the matter.  Hoff's opening brief -- submitted over a year after the Pennsylvania Superior Court decided Consolidated Rail -- conceded that the applicable standard of review was clear error.  New arguments cannot be raised in a Rule 28(j) letter.  See Ruskai v. Pistole, 775 F.3d 61, 66 (1st Cir. 2014); Lattab v. Ashcroft, 384 F.3d 8, 17 (1st Cir. 2004).

before, "[t]he clear-error standard is extremely deferential. Under it, 'we ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'" United States v. Márquez, 280 F.3d 19, 26 (1st Cir. 2002) (quoting Cumpiano v. Banco Santander, 902 F.2d 148, 152 (1st Cir. 1990)).

Carlton and Hoff's execution of the DPA gave rise to a principal-agent relationship. See generally 20 Pa. Cons. Stat. § 5601 (2015).[14] Under Pennsylvania law, an agent's renunciation of the duties and obligations of such relationship must be positive, unequivocal, and made known to the principal for it to be effective. Bergner v. Bergner, 67 A. 999, 1001 (Pa. 1907). Furthermore, "the burden of proving renunciation of one's obligations rests on the party asserting it." Shafer v. A. I. T. S., Inc., 428 A.2d 152, 155 (Pa. Super. Ct. 1981).

The district court found that the Estate did not meet its burden of proving that Hoff renounced the DPA. Our review of the record leads us to conclude the same. Thus, we find no error in the district court's finding, much less a clear error.

---

Since Hoff failed to raise this argument in his opening brief, we deem it waived. See Med. Mut. Ins. Co. of Me. v. Indian Harbor Ins. Co., 583 F.3d 57, 61 (1st Cir. 2009).

[14] As mentioned above, the parties do not contest that the DPA was governed by Pennsylvania law.

-17-

We agree with the district court's assessment of the deposition testimony upon which it primarily relied to reach its finding that Hoff did not renounce the DPA. See Stauffer, 2018 WL 5092885, at *10. During the deposition, which was taken for a separate Pennsylvania state court proceeding,[15] Hoff was asked, "Do you recall ever discussing the possible termination of the power of attorney directly with your father?"; to which he responded, "I don't, but I could have said . . . I'm not doing anything with it now, it's really a non-issue, but it would hurt my feelings if it were terminated." Below and now before us, the Estate attempts to save itself from Hoff's deposition testimony by contradictorily asserting that Hoff actually told Carlton during the March 15 meeting that "he would no longer be exercising any rights granted to him under the [DPA]." But, as the district court noted, "if true, this [purported statement] would not constitute a renunciation" because it "only expresses an intent not to use the [DPA], not a 'positive and unequivocal' renunciation of it." Id. (quoting Bergner, 67 A. at 1001); see 20 Pa. Cons. Stat. § 5604(b) (2017) ("Unless the power of attorney states a time of termination, it is valid notwithstanding the lapse of time since its

---

[15] See Estate of Stauffer v. Bielava, No. 906 MDA 2015, 2016 WL 4882571 (Pa. Super. Ct. July 20, 2016).

-18-

execution.").[16]  As such, Hoff's purported March 15 meeting statement is -- as a matter of law -- inconsequential to the question of whether he renounced the DPA.

A close look at Hoff's deposition testimony further supports the district court's conclusion that Hoff never renounced the DPA.  During his deposition, Hoff testified that he was not going to do anything with the DPA "now," referencing a point in time after the March 15 meeting.  This strongly suggests that Hoff believed his rights under the DPA went uninterrupted after the March 15 meeting, which clearly contradicts his claim of renunciation during said meeting.  Moreover, in a letter Hoff sent to Carlton's psychologist, Dr. Stanley E. Schneider, Hoff represented that he held the DPA until Carlton's death in 2012.

---

[16]  We note that the language used by the district court strongly suggests that it did not grant credibility to Hoff's contradictory statement, which was memorialized in a supplemental answer to interrogatories submitted a mere five days after a deposition in the present case.  See Stauffer, 2018 WL 5092885, at *10 ("[I]f true, this would not constitute a renunciation. The purported statement only expresses an intent . . . ." (emphasis added)); see also State Police Ass'n of Mass. v. Comm'r, 125 F.3d 1, 5 (1st Cir. 1997) (holding that our "mode of review requires us to accept [the lower court's] credibility determinations and its findings about historical facts unless, after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong"); Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 576 (1st Cir. 1980) ("The presumption of correctness reflected in the 'clearly erroneous' rule applies not only when the district court's findings are based upon its assessment of conflicting testimony, but also when . . . much of the evidence is documentary . . . .").

See <u>Stauffer</u>, 2018 WL 5092885, at *10.

The Estate also contends that the district court erred in finding that Hoff did not renounce the DPA because "uncontested evidence" establishes that Hoff notified individuals to whom he had previously represented himself as Carlton's agent -- Carlton's daughter, accountant, and attorneys -- that he would no longer act pursuant to the DPA. These notifications to third parties, however, do not help the Estate. For a renunciation to be effective "it is essential that it be made known to the principal," <u>Bergner</u>, 67 A. at 1001, and the Estate fails to identify any part of the record that undermines the district court's conclusion that "there is no evidence [showing] that any of [the third parties] communicated [Hoff's unwillingness to act under the DPA] to Carlton." <u>Stauffer</u>, 2018 WL 5092885, at *10.

Finally, we point out an additional consideration that favors the district court's finding that Hoff did not renounce the DPA. After the March 15 meeting, Carlton drafted three letters purporting to revoke Hoff's DPA.[17] We find no reason for Carlton to have drafted the three letters purporting to revoke the DPA if Hoff had previously made it unequivocally clear to Carlton that he renounced the DPA during the March 15 meeting. See <u>Bergner</u>, 67 A.

---

[17] As stated above, none of these letters were ever sent to Hoff.

-20-

at 1001. One cannot revoke an agency that has already been renounced.

Based on the foregoing analysis, we conclude that the district court's finding that Hoff never renounced the DPA was correct. Thus, the court did not commit clear error in reaching this factual conclusion.

### III. <u>CONCLUSION</u>

For the reasons explained above, we affirm the district court's judgment dismissing the Estate's complaint for lack of subject matter jurisdiction.

**<u>Affirmed</u>**.